IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CASEY HAMILTON, individually and as parent and guardian of N.B.O., a minor child, <br><br> Plaintiff, <br><br> v. <br><br> OKLAHOMA DEPARTMENT OF HUMAN SERVICES, an agency of the State of Oklahoma; DEBORAH SHROPSHIRE, M.D., individually and in her capacity as former Director of the Child Welfare Services Division of the Department of Human Services; LAURA STRAIN; and KAYLA GREGSTON, <br><br> Defendants. | Case No. 25-cv-00074-SH |

**OPINION AND ORDER**

Before the Court are dismissal motions filed by Defendants Laura Strain, Deborah Shropshire, and the Oklahoma Department of Human Services ("DHS").[1]  Plaintiff has failed to show that the actions of Strain shock the conscience or that Shropshire's subordinates violated N.B.O.'s constitutional rights.  Defendants Strain and Shropshire's motions to dismiss will be granted.

As for DHS, the Court rejects its broad and ill-defined assertion of expansive immunity from suit, given the limited argument it has provided.  As currently alleged, Plaintiff asserts claims for negligence that fall outside the narrowly construed exceptions to the Oklahoma Governmental Tort Claims Act.  DHS's motion to dismiss will be denied.

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (ECF No. 21.)

**Factual Background**

Taking the factual allegations in the amended petition as true, and viewing them in the light most favorable to the nonmoving party, Plaintiff alleges as follows:

Plaintiff Casey Hamilton ("Hamilton") is the biological mother of N.B.O., a minor child born in 2021. (Am. Pet. ¶ 1.[2]) In September 2022, N.B.O. was taken into DHS custody and placed in the care of Kayla Gregston ("Gregston").[3] (*Id.* ¶¶ 11–12.) While in Gregston's care, on or around September 30, 2022, N.B.O.'s biological father ("Father") had a supervised visit with N.B.O. (*Id.* ¶ 14.) Defendant Laura Strain ("Strain"), a DHS employee, accompanied Father. (*Id.* ¶¶ 5, 14.) During the visit, Father noticed that N.B.O. was unable to move her right arm, had bruising around her right eye, and was crying a lot. (*Id.* ¶ 14.) Father contacted Hamilton, who came and asked Strain about the black eye and N.B.O. favoring her right arm. (*Id.* ¶¶ 15–16.) Strain stated she had not noticed the black eye due to how red N.B.O.'s eyes were from crying, which Strain indicated Gregston said was due to N.B.O.'s teething. (*Id.* ¶ 16.) When Hamilton then contacted Gregston, Gregston advised that she may have pulled N.B.O. out of her car seat too hard, but she claimed nothing nefarious had occurred. (*Id.* ¶ 17.)

At some point after speaking with Gregston, Hamilton raised concerns with Strain that N.B.O. was being abused and/or neglected. (*Id.* ¶ 18.) Strain adamantly refused to believe N.B.O. was being abused, but after Hamilton persisted, on October 2, 2022, she went with Hamilton and N.B.O. to an urgent care in Broken Arrow. (*Id.* ¶¶ 18–20.) There,

---

[2] Plaintiff's operative complaint—the amended petition—is included as an attachment to Defendants' notice of removal (ECF No. 2 at 22–36). For ease of reference, the Court will cite to the "amended petition" when referring to this document.

[3] At times, the amended petition alleges these events occurred in 2023, instead of 2022. This appears to be a scrivener's error.

N.B.O. underwent an x-ray of her right forearm, which showed "no definite evidence for acute fracture or dislocation." (*Id.* ¶ 21.) Following the urgent care trip, Strain returned N.B.O. to Gregston's home. (*Id.* ¶ 22.) The next day, on October 3, 2022, Gregston sent Strain photographs of N.B.O. holding a bottle. (*Id.* ¶ 23.)

After the trip to urgent care, Hamilton had daily supervised visits with N.B.O. (*Id.* ¶ 24.) During her visit on October 3, 2022, Hamilton observed additional bruising around one of N.B.O.'s ears. (*Id.* ¶ 25.) Hamilton raised concerns about the bruising with the DHS employee supervising the visit, who sent a picture of the bruises to a DHS nurse for review. (*Id.* ¶ 26.) Upon reviewing the photo with a supervisor, the nurse recommended N.B.O. be returned to Gregston. (*Id.*)

The next day, during Hamilton's supervised visit, she noticed that N.B.O. appeared to be covered entirely in bug bites, and Hamilton again raised her concerns with DHS. (*Id.* ¶¶ 27–28.) On October 5, 2022, Strain contacted Hamilton to advise her that Strain's supervisor had approved Hamilton to take N.B.O. to the emergency room for a more complete evaluation. (*Id.* ¶ 29.) Hamilton took N.B.O. to the emergency room at Saint Francis Hospital where a nonaccidental trauma evaluation was performed. (*Id.* ¶ 30.) During the exam, medical staff noted obvious bruising on N.B.O.'s right elbow, right forearm, the right side of her face, and the right side of her back. (*Id.* ¶ 31.) At some point later, radiology revealed N.B.O. had a right forearm/elbow fracture. (*Id.* ¶ 32.) DHS spoke with a social worker at Saint Francis about the nonaccidental trauma evaluation, and DHS advised that N.B.O. could be discharged home with Hamilton, under the supervision of Hamilton's mother. (*Id.* ¶ 33.)

On October 6, 2022, Hamilton and Strain took N.B.O. to OU Medical Center. (*Id.* ¶ 34.) There, Dr. Michael Baxter, a pediatric physician who specializes in child abuse and

neglect, performed a "Child Abuse and Neglect Pediatrics Exam" on N.B.O. (*Id.*) Dr. Baxter noted that N.B.O.'s facture was highly concerning for physical abuse based on her age, fracture type, and lack of history, and noted that N.B.O.'s ear bruising was also highly concerning for physical abuse. (*Id.* ¶ 35.) In his report, he concluded that he was very concerned about N.B.O.'s safety and wellbeing while in the environment where the injuries happened, and he advised that a full DHS and law enforcement investigation was needed. (*Id.*)

### Procedural Background

Hamilton filed suit, asserting claims on behalf of N.B.O. against the moving defendants and Gregston.[4] Against Defendants Strain and Shropshire, Hamilton asserts claims under 42 U.S.C. § 1983 for violation of the 14th Amendment. (Am. Pet. ¶¶ 43–71.) Against DHS, Hamilton asserts negligence and state constitutional violations. (*Id.* at ¶¶ 72–85.) Hamilton also asserts a negligence claim against Gregston. (*Id.* ¶¶ 86–89.) Gregston has filed an answer, while the other defendants have moved to dismiss.

In their motions, Defendants Strain and Shropshire argue Hamilton has failed to state a claim, because (1) she does not allege a constitutional violation and (2) both defendants are entitled to qualified immunity. (ECF No. 10 at 5–8; ECF No. 11 at 5–7.[5]) DHS also moves to dismiss, arguing Hamilton's claims—as pled—are barred by

---

[4] The amended petition states that Hamilton brings her claims both "individually and as parent and guardian of N.B.O." (ECF No. 2 at 22.) In her briefing, however, Strain asserts that Hamilton brings only representative claims. (ECF No. 10 at 5 n.2.) Hamilton does not dispute this characterization and only makes arguments regarding her claims on behalf of N.B.O. The Court, therefore, does not consider whether Hamilton brings any claims in her individual capacity.

[5] Citations to page numbers refer to the page number in the court-provided header.

exemptions to the Oklahoma Governmental Tort Claims Act ("OGTCA"), Okla. tit. 51, §§ 151–171.  (ECF No. 12 at 3–6.)

## Analysis

### I. Standard of Review

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  All such reasonable inferences are resolved in the plaintiff's favor.  *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citation modified).

Here, Strain and Shropshire move to dismiss on the basis of the affirmative defense of qualified immunity, which creates a presumption that the defendant is immune from suit.  *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).  To overcome that presumption, "the plaintiff must show (1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct."  *Id.* (noting that, at the dismissal stage, the Court analyzes the defendant's conduct as alleged in the complaint).  The sequence in which the Court considers these factors is in the Court's discretion.  *Pearson v. Callahan*, 555 U.S. 223,

236 (2009). As discussed below, the Court finds Plaintiff has failed to allege that the individual defendants violated N.B.O.'s rights and does not reach the second factor.

Meanwhile, Defendant DHS asserts that Hamilton's claims against it are barred by its sovereign immunity, which has not been waived under the OGTCA. (ECF No. 12 at 3.) Eleventh Amendment immunity, or sovereign immunity, concerns the subject-matter jurisdiction of this Court. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). Thus, DHS's motion to dismiss is more properly construed as one falling under Fed. R. Civ. P. 12(b)(1). Still, the standard of review remains the same here. DHS does not go beyond the allegations in the complaint and, instead, presents a facial attack. *See Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003) (contrasting facial and factual attacks on jurisdiction). In a facial attack, the Court accepts the allegations in the complaint as true, *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001), and applies the same standards as are applicable to a 12(b)(6) motion, *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).

## II.   Strain's Motion to Dismiss

Hamilton alleges Strain is liable under 42 U.S.C. § 1983 for violating N.B.O.'s 14th Amendment rights.[6] (Am. Pet. ¶¶ 43–71.) In particular, she alleges Strain violated N.B.O.'s rights by placing her in the care of Gregston, failing to reasonably and properly investigate allegations that Gregston committed child abuse and neglect against N.B.O., failing to remove N.B.O. from Gregston's custody, and ignoring Hamilton's requests for such removal. (*Id.* ¶ 49.) According to Hamilton, this caused N.B.O. to be harmed while in Gregston's care. (*Id.* ¶ 55; *see also* ECF No. 24 at 1.))

---

[6] Pursuant to § 1983, every person who, under color of state law, deprives another of their constitutional rights shall be liable to the injured party. 42 U.S.C. § 1983

## A. The Special Relationship Doctrine

"In general, state actors may only be held liable under § 1983 for their own acts, not the acts of third parties." *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). "But there are two recognized exceptions to this general rule: (1) the special relationship doctrine; and (2) the danger creation theory." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018) (citation modified). Plaintiff argues her claims meet the elements of the special relationship doctrine. (ECF No. 24 at 7.)

"The special-relationship doctrine protects individuals—including foster children—who involuntarily enter state custody and subsequently become reliant on the State, through its agencies and officials, to provide their basic human needs, paramount among those safety." *Gutteridge*, 878 F.3d at 1238 (citation modified). The existence of this special relationship "triggers a continuing duty that is subsequently violated if a state official knew of the asserted danger to a foster child or failed to exercise professional judgment with respect thereto, and if an affirmative link to the injuries the child suffered can be shown." *Id.* at 1238–39 (citation modified). The duty is "imposed on state custodial officials" and is "not a duty limited to only the specific officials who executed the placement of the child." *Schwartz v. Booker*, 702 F.3d 573, 581 (10th Cir. 2012). To be liable under the special-relationship doctrine, a defendant must have abdicated their professional duty to an extent sufficient to shock the conscience.[7] *Gutteridge*, 878 F.3d at 1239.

---

[7] In her briefing, Hamilton does not argue Strain is liable under the danger creation theory. But that doctrine similarly requires conduct that shocks the conscience. *See Robbins*, 519 F.3d at 1251 (noting the prima facie elements of the danger creation exception include that "the conduct, when viewed in total, shocks the conscience").

Conscience-shocking action is more than negligence. *Halley v. Huckaby*, 902 F.3d 1136, 1155 (10th Cir. 2018); *see also DeAnzona v. City & Cnty. of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000) ("Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking."). Such conduct consists of "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Halley*, 902 F.3d at 1155 (quoting *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013)). That is, the government actor arbitrarily abused her authority or employed her authority as an instrument of oppression. *Id.* (noting that the behavior must be egregious and outrageous). Courts consider the defendant's "conduct as a whole—both action and inaction—in assessing whether that behavior is conscience shocking." *Est. of Place v. Anderson*, No. 19-1269, 2022 WL 1467645, at *5 (10th Cir. May 10, 2022) (unpublished) (citation modified).[8] When evaluating substantive due process claims, a court must consider "(1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Schwartz*, 702 F.3d at 586 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995)).

### B.    Strain's Alleged Conduct Does Not Shock the Conscience

Plaintiff's amended petition—even read liberally and with all inferences resolved in Plaintiff's favor—fails to allege Strain acted (or failed to act) in a way that shocks the conscience.

---

[8] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

Plaintiff alleges that on September 30, 2022, Strain attended a supervised visit where Hamilton raised concerns regarding N.B.O. favoring her right arm and bruising around her eye. Strain claimed not to have noticed the bruising around N.B.O.'s eye due to N.B.O.'s crying. She appeared to believe Gregston's explanation that the crying was caused by teething. Strain was adamant in not believing that abuse was occurring. When Plaintiff continued to raise concerns, Strain accompanied Hamilton and N.B.O. to an urgent care for evaluation on October 2, 2022. The urgent care staff said an x-ray on N.B.O.'s right arm showed no definite evidence of an acute fracture or dislocation. The amended petition contains no allegations regarding whether Strain or Hamilton raised N.B.O.'s eye bruising at the visit. Strain then returned N.B.O. to Gregston's care. The next day, Strain received a photograph from Gregston of N.B.O. holding a bottle.

On October 3rd and 4th, Hamilton raised concerns about N.B.O.'s condition with others at DHS. Then, on October 5th, Strain contacted Hamilton and conveyed that her supervisor had given Hamilton permission to take N.B.O. to the emergency room, which Hamilton did. After the emergency room trip—which revealed a right forearm/elbow fracture and bruising on N.B.O.'s right elbow, forearm, side of her face, and back—someone at DHS authorized N.B.O. to go home with Hamilton and her mother. On October 6, 2022, Strain then accompanied Hamilton and N.B.O. to OU Medical Center for an abuse and neglect exam, where the examining doctor opined that the injuries were highly concerning for abuse, raised concerns about N.B.O.'s safety at the location where the injuries occurred, and said an investigation was needed. There are no allegations that N.B.O. ever returned to Gregston's home after the ER trip on October 5th.

As pled, none of Strain's actions shock the conscience. Despite her apparent misgivings, Strain followed up on Hamilton's concerns each time they were raised, and

9

attended two of the three medical appointments with Hamilton and N.B.O. The only lack of action alleged is the two days between Hamilton's initial concerns and the urgent care visit, but there are no allegations to support a conclusion that this delay was conscience shocking under the circumstances. Instead, once the visit occurred, the allegations are that the urgent care facility found no definite evidence of acute fracture/dislocation of the right arm. There are no allegations that evidence of abuse was found at that first medical visit. Nor are there any allegations that Hamilton's complaints over the coming days were relayed to Strain. Stain's next involvement appears to be when she conveyed that Hamilton was permitted to go to the ER. At that point, as medical findings validated Hamilton's reports, N.B.O. was removed from Gregston's care. Even if Hamilton's amended petition could be said to plead claims demonstrating a failure to exercise professional judgment, Strain's alleged actions and inactions cannot be described as arbitrary abuses of authority, egregious, or outrageous.[9]

As such, Plaintiff has failed to allege a constitutional violation, and Strain's motion to dismiss will be granted.

## III. Shropshire's Motion to Dismiss

Hamilton also brings a § 1983 claim against Defendant Shropshire, who was the director of DHS's Child Welfare Services division and the medical director for children in

---

[9] The cases cited by Hamilton in her briefing do not support a contrary conclusion. (ECF No. 24 at 10–11.) In *Currier v. Doran*, the defendant had prior information about the guardian's financial irresponsibility, failed to investigate bruises, and then was responsible for a court order granting legal custody to the guardian. 242 F.3d 905, 920 (10th Cir. 2001) (finding such allegations conscience shocking when viewed in total). In *Matthews v. Bergdorf*, the allegations themselves were not conscience shocking, but rendered it plausible that the defendant failed to exercise professional judgment regarding a conscience-shocking situation that grew worse over time. 889 F.3d 1136, 1149 (10th Cir. 2018).

foster care. (Am. Pet. ¶ 3.) Hamilton alleges Shropshire "had supervisory responsibility to ensure that DHS adopts and implements policies that protect children in DHS custody from unreasonable risk of harm." (*Id.* ¶ 61.) Hamilton contends the acts and omissions of DHS staff were in furtherance of, and were consistent with, the customs, policies, and practices implemented by Shropshire, which included: (1) failing to ensure DHS employees like Strain were adequately trained and competent to investigate complaints of child abuse; (2) failing to supervise and monitor employees like Strain during investigations into child abuse; (3) failing to adopt policies or procedures to ensure children in DHS custody receive timely medical care; (4) ordering children in DHS custody to remain in foster care placement when there was credible evidence of abuse or neglect; and (5) failing to consult other employees to investigate such credible evidence. (*Id.* ¶¶ 38–39.)

### A.  Supervisory Liability

"[C]ommon to all § 1983 . . . claims is the requirement that liability be predicated on a violation traceable to a defendant-official's 'own individual actions.'" *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 676). A party cannot use *respondeat superior* to hold an official liable for the unconstitutional conduct of their subordinates. *Iqbal*, 556 U.S. at 676; *see also id.* at 677 (noting that "supervisory liability" is a misnomer). This means the plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation," which is more than a mere knowledge of the subordinate's conduct. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A successful claim based on a defendant's "supervisory responsibilities" requires "(1) personal involvement; (2) causation[;] and (3) state of mind." *Id.* Moreover, "for a claim of supervisory liability to succeed, the

plaintiff must establish a subordinate's underlying constitutional violation." *Sherman v. Klenke*, 653 F. App'x 580, 589 (10th Cir. 2016) (unpublished) (citing *Gray v. Univ. of Colorado Hosp. Auth.*, 672 F.3d 909, 918 n.7 (10th Cir. 2012)).

### B.   Plaintiff Fails to Allege an Underlying Constitutional Violation

In her briefing, Plaintiff relies entirely on the actions of Defendant Strain in arguing for the existence of an underlying constitutional violation. (ECF No. 25 at 9.) As noted above, those allegations fail.

The Court, however, has also considered the allegations involving other, unnamed DHS employees in conjunction with Strain's conduct. Even considering the conduct of these employees, as a whole, the Court still finds a failure to allege conscience-shocking conduct. Those additional allegations cover the two days between N.B.O.'s "no definite evidence" x-ray and Strain's communication that N.B.O. could be examined at the emergency room. On the first day, Hamilton noticed bruising around one of N.B.O.'s ears, which she raised with a DHS employee. That employee sent a picture of the bruising to a DHS nurse, who reviewed the photo with a supervisor and recommended N.B.O. be returned to Gregston. The second day, Hamilton told a DHS employee that N.B.O. appeared to be covered in bug bites. Between that visit and the ER authorization on the third day, Hamilton does not allege any action was taken. Considered both separately and in the broader context of Strain's actions, these allegations do not show a failure to investigate or act that rises to the level of being conscience shocking.

Because Plaintiff has failed to allege conduct by Shropshire's subordinates that shocks the conscience and, therefore, violated N.B.O.'s rights, Plaintiff cannot establish supervisory liability. Shropshire's motion to dismiss will be granted.

## IV. DHS's Motion to Dismiss

Finally, Hamilton brings claims against DHS for negligence and violation of the Oklahoma Constitution. (Am. Pet. ¶¶ 72–85.) Generally, Hamilton asserts DHS "recklessly and knowingly placed N.B.O. in harm's way by neglecting to take precautionary steps to ensure her safety and wellbeing and requiring her to stay in the care of Defendant Gregston." (*Id.* ¶ 75; *see also id.* ¶ 78 (alleging DHS failed to thoroughly investigate Hamilton's complaints).) Hamilton also alleges DHS negligently failed to ensure that N.B.O. received timely medical care for her injuries. (*Id.* ¶ 82.) Hamilton's negligence claims appear to turn primarily on DHS's actions regarding the arm injury first observed on September 30, 2022. (*Id.*)

DHS does not contest Hamilton's assertions of negligence or violation of the Oklahoma constitution on the merits.[10] Instead, DHS argues that the entirety of Hamilton's claims against it are exempted from liability under various provisions of the OGTCA. (ECF No. 12 at 4–6 (citing Okla. Stat. tit. 51, § 155(4)–(5), (18), (29)).) As the OGTCA retains Oklahoma's sovereign immunity unless specifically waived therein, DHS argues it is immune from suit. (*Id.* at 3.)

### A.    The OGTCA—Generally

The State of Oklahoma has adopted the doctrine of sovereign immunity and asserts immunity from any tort claims brought against it, its political subdivisions, and any of their employees acting within the scope of their employment. Okla. Stat. tit. 51, § 152.1(A). In the OGTCA, Oklahoma waives its immunity and that of its political

---

[10] DHS does argue that Hamilton's claims under Oklahoma's constitution are similarly restricted by the immunity asserted (and waived) in the OGTCA. (ECF No. 12 at 3 n.1.) On this point, DHS is correct. *See Barrios v. Haskell Cnty. Pub. Facilities Auth.*, 2018 OK 90, ¶ 12, 432 P.3d 233, 238–39.

subdivisions, but "only to the extent and in the manner provided in [the] act." *Id.* § 152.1(B).

As such, the OGTCA "is the exclusive remedy by which an injured plaintiff may recover against a governmental entity for its negligence." *Smith v. City of Stillwater*, 2014 OK 42, ¶ 14, 328 P.3d 1192, 1198. Under the act, DHS is "liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment . . . where [DHS], if a private person or entity, would be liable for money damages under the laws of" Oklahoma. Okla. Stat. tit. 51, § 153(A). DHS is liable "subject to the limitations and exceptions specified in" the OGTCA. *Id.*

These exceptions are an enumerated list of "carefully circumscribed" instances in which state arms like DHS will not be liable. *Skurnack v. State ex rel. Dep't of Hum. Servs.*, 2002 OK CIV APP 37, ¶ 5, 46 P.3d 198, 199 (citing Okla. Stat. tit. 51, § 155). Such exceptions (or exemptions) are construed "restrictively." *Gutteridge*, 878 F.3d at 1243.

The Court will review each of the exemptions claimed by DHS in turn.

### B.  Section 155(4)—Adoption or Enforcement of the Law

DHS first claims it is exempt based on its adoption or enforcement of a law, or its failure to adopt or enforce a law—including any statute. (ECF No. 12 at 4 (citing Okla. Stat. tit. 51, § 155(4)).) Per Oklahoma statute, a DHS office "receiving a child abuse or neglect report shall promptly respond to the report by initiating an investigation of the report or an assessment of the family in accordance with priority guidelines established" by DHS.[11] Okla. Stat. tit. 10A, § 1-2-105(A)(1). Such investigation or assessment may

---

[11] DHS does not state with specificity the law it asserts it was enforcing in this case, but it cites cases that rely on this statute or its predecessor. (ECF No. 12 at 4.) In response, Hamilton argues her claims rest on DHS's "implementation of its existing policies and *(cont....)*

14

include a medical examination of the child. *Id.* § 1-2-105(B)(2). DHS argues its employees were fulfilling their obligations under "these state statutes and the related regulations and policies," so the exemption controls. (ECF No. 12 at 5–6.)

Courts have found the "enforcement of a law" exemption to apply both when DHS chooses to investigate an allegation of child abuse (resulting in damages to a parent or target of the investigation) and when DHS takes no action when informed of child abuse (and the child is later injured by their guardian). *See Skurnack*, ¶ 10, 46 P.3d at 200–01 (dismissing claims for damages where children were removed from home due to DHS investigation); *Pierce v. Okla. ex rel. Dep't of Hum. Servs.*, No. 08-CV-014-JHP, 2008 WL 2987190, at *1, 3 (E.D. Okla. Aug. 1, 2008) (dismissing claims where day care owner asserted damages resulting from DHS investigation into alleged sex abuse); *GJA v. Okla. Dep't of Hum. Servs.*, 2015 OK CIV APP 32, ¶¶ 14–15, 17–19, 347 P.3d 310, 314 (dismissing claims based on failure to investigate); *Taylor v. Okla. ex rel. Dep't of Hum. Servs.*, No. 07-CV-380-GKF-PJC, 2008 WL 268333, at *4 (N.D. Okla. Jan. 29, 2008) (same); *Briggs v. Okla. ex rel. Okla. Dep't of Hum. Servs.*, 472 F. Supp. 2d 1304, 1308–10 (W.D. Okla. 2007) (dismissing claims that DHS failed to protect child from physical neglect and abuse), *aff'd on other grounds sub nom. Briggs v. Johnson*, 274 F. App'x 730 (10th Cir. 2008).

However, the Oklahoma Supreme Court has made it clear that the enforcement exemption does not encompass all actions taken by the State and its subdivisions once they decide to enforce a particular law. For example, in the context of a student allegedly

---

general breach of its legal duty to protect children in state custody . . . from harm" without further elaboration. (ECF No. 26 at 6–7.)

injured by a police officer who broke up a school fight, the Oklahoma Supreme Court stated,

> The purpose of § 155(4) is to protect the discretionary acts of law enforcement officers in deciding whether a given situation calls for enforcing a law or not. That choice, whichever way it goes, may result in a detriment visited upon either the person with whom the officer is engaged or upon a third person. It is the exercise of that discretion which is protected by this exemption. **Once an officer makes the decision to enforce a law by making an arrest, he or she must do so in a lawful manner.** If a tort is committed in the process of making an arrest, § 155(4) does not provide immunity from suit to the officer's governmental employer for the resulting damages.

*Morales v. City of Okla. City ex rel. Okla. City Police Dep't*, 2010 OK 9, ¶ 12, 230 P.3d 869, 876 (emphasis in original); *see also State ex rel. Okla. Dep't of Pub. Safety v. Gurich*, 2010 OK 56, ¶ 10, 238 P.3d 1, 4 ("Negligent performance of a law enforcement function is not shielded from immunity under the GTCA.").

This principle has been applied to deny the exemption where an employee acted negligently in implementing the law (or policy) at an operational level, or in otherwise choosing to enforce a law. *J.W. v. Indep. Sch. Dist. No. 10*, 2021 OK CIV APP 34, ¶¶ 1, 39, 500 P.3d 649, 654, 659–60 (implementation of bullying policy); *see also Brown v. Muldrow Pub. Sch.*, 2024 OK CIV APP 20, ¶ 38, 557 P.3d 1063, 1078 ("Although the School District's decision to enforce or not to enforce a particular bullying policy is protected by § 155(4), once the School District made the decision to enforce the policy, it must do so in a manner consistent with the applicable standard of care."); *Smith*, ¶ 18, 328 P.3d at 1199 (law enforcement officer allegedly acted negligently after choosing to enforce law by conducting a vehicular pursuit of suspected offender).

It is difficult to read these more recent Oklahoma cases as consistent with the sort of broad exemption from liability argued for by DHS. It appears settled that DHS has

16

immunity for its decision to investigate (or not investigate) Hamilton's fears that Gregston might be abusing N.B.O.  However, the allegations in the Amended Petition go beyond mere investigatory actions and extend, for example, to whether DHS failed to ensure that a ward of the state received timely medical care.  (*See, e.g.*, Am. Pet. ¶ 82.) These allegations are not neatly cabined into a singular decision of whether to enforce the statute for investigation of child abuse.  Therefore, DHS has failed to show in its briefing that Hamilton's claims—*as pled*—are categorically barred by the OGTCA.

C.  **Section 155(5)—Performance of Discretionary Acts**

DHS next argues that its alleged actions/inactions fall within the exemption for the "[p]erformance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees." Okla. Stat. tit. 51, § 155(5) (cited in ECF No. 12 at 4–5).  Again, DHS does not cite the specific discretionary acts it asserts are exempt, but instead simply cites a case that found the negligent training and supervision of police officers to be an exempt discretionary act.  (ECF No. 12 at 5 (citing *Burns v. Holcombe*, No. 09-CV-152-JHP, 2010 WL 2756954, at *15 (E.D. Okla. July 12, 2010)).)

As the Oklahoma Supreme Court has cautioned, the discretionary function exemption is "extremely limited," because "[a]lmost all acts of government employees involve some element of choice and judgment . . . ." *Nguyen v. State*, 1990 OK 21, ¶ 4, 788 P.2d 962, 964.  Under the approach adopted by Oklahoma, "initial policy level or planning decisions are considered discretionary and hence immune, whereas operational level decisions made in the performance of policy are considered ministerial and not exempt from liability." *Id.* ¶ 5, 788 P.2d at 964–65; *see also J.W.*, ¶ 48, 500 P.3d at 661 (once "a governmental employer establishes a policy, tort liability for the acts of its

17

employees is determined by whether the acts allegedly committed by those charged with executing that policy on a daily basis 'fall below' the applicable standard of care" (citing *Nguyen*, ¶ 8, 788 P.2d at 966)).

Other than citing a non-precedential case involving negligent hiring and supervision, DHS does not explain or provide support for its assertion that its alleged acts in this case are covered by the discretionary function exemption. As noted above, Hamilton's allegations include acts of purported negligence, such as failure to obtain timely medical care, that appear to fall outside of this exemption. Thus, DHS does not demonstrate that Hamilton has failed to state a claim.

### D. Section 155(18)—Acts of Non-Employees

DHS also argues it is exempt because Hamilton is trying to hold it liable for Gregston's negligence. (ECF No. 12 at 6.)

The OGTCA protects the State from liability for an "act or omission of an independent contractor or consultant . . . or of a person other than an employee of the state or political subdivision at the time the act or omission occurred." Okla. Stat. tit. 51, § 155(18). As Hamilton correctly notes in her response, she is not asserting claims against DHS based on the actions of Gregston. (ECF No. 26 at 9–10.) Instead, she is asserting that DHS employees acted negligently in, among other things, failing to ensure N.B.O. received timely medical care and returning N.B.O. to Gregston's care. (Am. Pet. ¶ 82.) This exemption does not apply to the claims as pled.

### E. Section 155(29)—Placement of Children

Finally, DHS argues it is exempt from liability, because Hamilton's claims are "about the 'placement of' the child" with Gregston. (ECF No. 12 at 6.) Under the OGTCA,

the State retains immunity from "[a]ny claim based upon an act or omission of an employee in the placement of children." Okla. Stat. tit. 51, § 155(29).

Courts have made it clear, however, that this exemption does not apply to decisions relating to whether to <u>remove</u> a child from a home—even if DHS had placed the child in that home in the first place. *See, e.g., Gutteridge*, 878 F.3d at 1245 (noting DHS's alleged acts and omissions occurred both after the child's initial placement and after DHS had already intervened); *see also GJA*, ¶ 20, 347 P.3d at 314 ("The Legislature could have, but did not, include 'removal of children' in this subdivision of the statute."). DHS's arguments are thus precluded by binding Tenth Circuit precedent.

Reviewed separately and in total, the OGTCA exemptions may provide some immunity to DHS as to some of the alleged wrongful acts, but they do not provide the blanket protection DHS asserts as to all of Hamilton's claims. DHS's motion to dismiss will be denied.

## Conclusion

IT IS THEREFORE ORDERED that Defendant Laura Strain's *Motion to Dismiss* (ECF No. 10) is GRANTED; Defendant Deborah Shropshire's *Motion to Dismiss* (ECF No. 11) is GRANTED; and Defendant Oklahoma Department of Human Services' *Motion to Dismiss* (ECF No. 12) is DENIED.

Plaintiff's claims against Defendants Laura Strain and Deborah Shropshire are DISMISSED WITHOUT PREJUDICE. Defendant Oklahoma Department of Human Services shall file an answer to Plaintiff's amended petition within 14 days of this order.

ORDERED this 3rd day of September, 2025.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT